**VERIZON DIRECTORIES CORP., Plaintiff,**

v.

**YELLOW BOOK USA, INC., Defendant.**

**No. 04–CV–0251(JBW).**

United States District Court, E.D. New York.

Aug. 19, 2004.

Charles B. Molster, III, Winston & Strawn, Washington, DC, Dan K. Webb, Winston & Strawn, Chicago, IL, John P. Frantz, John Thorne, Verizon Communications, Arlington, VA, Peter Dykema, Lawrence O. Kamin, Willkie, Farr & Gallagher, LLP, Richard Henry Dolan, Schlam, Stone & Dolan, LLP, New York, NY, James M. Koukios, Steven G. Bradbury, Steven A. Engel, Kirkland & Ellis LLP, Washington, DC, for Plaintiff.

Carolyn Lisa Miller, Willkie, Farr & Gallagher, LLP, Matthew A. Leish, Robert D. Balin, Samuel M. Leaf, Sharon Lee Schneier, Victor A. Kovner, Davis Wright Tremaine LLP, Lawrence O. Kamin, Willkie Farr & Gallagher, LLP, New York, NY, for Defendant.

### MEMORANDUM & ORDER

WEINSTEIN, Senior District Judge.

### I. *Introduction*

Verizon Directories Corporation has sued Yellow Book USA, Inc., alleging that the defendant has used false or misleading representations in advertising and in sales and marketing communications. *See* 15 U.S.C. § 1125(a). The current phase of the litigation is a bench trial to determine preliminary injunctive relief, permanent injunctive relief and liability (damages issues, if any, to be put off for later jury determination).

The parties have presented almost all exhibits in computer-generated formats as well as by hard copy. They were dubious about the admissibility of the many pedagogical devices (often called "demonstratives") used in the trial. For the reasons stated below, the court finds that the scores of pedagogical devices used at trial, except for those stricken for error or lack of utility, are admitted into evidence.

### II. *Pedagogical Devices*

#### A. *Computer–Generated Pedagogical Devices*

The applicable literature identifies four overlapping main categories of computer generated exhibits: static images, animations, simulations, and computer models. *See, e.g.,* Fred Galves, *Where the Not–So–Wild Things Are: Computers in the Courtroom, the Federal Rules of Evidence, and the Need for Institutional Reform and More Judicial Acceptance,* 13 Harv. J. Law & Tech. 161, 177–81 (2000); Lori G. Baer & Christopher A. Riley, *Technology in the Courtroom: Computerized Exhibits and How to Present Them,* 66 Def. Couns. J. 176 (1999); Timothy W. Cerniglia, *Computer–Generated Exhibits–Demonstrative, Substantive or Pedagogical–Their Place in Evidence,* 18 Am. J. Trial Advoc. 1, 4–5 (1994). Presentations are frequently in a "power point" format with the attorney calling up data and images as needed from huge files.

The first category "consists of static images that are simply projected onto a large screen or computer panel or onto individual monitors by a computer display system." Galves, *supra,* at 177. These representations are common in courtrooms. They include tables, graphs, maps and diagrams.

Animations are, in their simplest terms, moving pictures. The computer allows otherwise static images to be "shown in rapid succession to create the [illusion] of motion." Baer & Riley, *supra,* at 177. The graphics are often crude or oversim-

plified. Animations are not intended "to recreate or simulate an event." *See* Cerniglia, *supra,* at 5.

The third category is "simulations" or "recreations." Computer functions allow the user to simulate actual events—or, more properly, the opinion of the creator as to the nature of the events. Most simulations are detailed and realistic. The recreated computer image of the event can be manipulated. It can be portrayed from different angles or from the viewpoints of different witnesses. A common use involves the recreation of accidents. *See, e.g., Datskow v. Teledyne Continental Motors,* 826 F.Supp. 677, 685–86 (W.D.N.Y. 1993) (noting that defendant objected to the "use of a videotaped computer-generated animation which illustrated ... theory of where the fire began inside the engine and how it spread.").

The fourth category, computer models, are "nothing more than a compilation of mathematical formulae and expressions that are integrated into a sophisticated computer program or series of programs." Cerniglia, *supra,* at 6. An expert witness may test multiple hypotheses with the model and form opinions based on the results, producing graphics explicating the results.

A fifth category should be admitted. It is "enhanced images," occupying the space between static images and animations. For the most part, an enhanced image is static, but the attorney or witness may manipulate the image through, for example, highlighting, enlarging particular areas, and utilizing side-by-side split screen presentations or video-taped depositions with printed commentary or transcripts moving below in tandem with the image and audio of the deponent. Different colors can be used to emphasize particular elements of the presentation or to show which parts of a deposition are being presented by one side or the other. The

parties may highlight selected text, enlarge graphics, modify images, or enlist other special effects to illuminate a relevant point. *See, e.g.,* Galves, *supra,* at 177 ("The computer technology here, therefore, simply makes those functions easier, quicker, and more legible and understandable.").

A sixth category, easel writings and diagrams created by an expert or attorney during the trial and in the presence of the trier, is old-hat. The technique is now improved by almost instantaneous computer creation of printed versions that can be projected onto the screen and converted to hard copy for the trier's notebook.

B. *Use of Pedagogical Devices in the Instant Trial*

Computer-generated exhibits in this trial are predominantly of the "enhanced images" type. The judge, witness, court reporter, and lawyers have computer monitors at their respective stations. There is a large screen in the courtroom. The particular documents relied on by a witness or lawyer are displayed on the personal monitors and projected onto the large screen as appropriate. Nearly every static image of a document is enhanced by highlighting in color the portion of the text believed by counsel to be telling, and by enlarging the selected text in a superimposed box.

Relevant video deposition testimony is shown on the monitors and large screen. The image of the deposition is supplemented by subtitles. Questions by plaintiff—and the concomitant responses are displayed in red–colored text. Defendant's questions and responses are shown in blue-colored text. Documents and other data may be simultaneously shown on split screens. The portions of depositions relied upon and counter designations are

broken up into "themes," explained by what amount to mini-summations.

The parties use graphics to complement testimony, showing graphs, numerical collections of raw and analyzed data from surveys, pie and bar charts, and cartoonish images of persons, stacks of books or other objects, and "thought bubbles." Although rudimentary, the images are effective in clarifying sometimes dense expert testimony, statistical surveys and theories. They also utilize easel writings and diagrams. When showing the television commercials at issue, images may be "freeze-framed." The information is projected onto the large screen in the courtroom and individual monitors from the party-operated computers or overhead projector (referred to by counsel as "the Elmo," a brand of projector not actually used in this trial).

Tens of thousands of "bates-numbered" pages that are part of comprehensive collection of documents may be called up by the computer as needed. "Bates" labeling is commonly used to assign numbers to pages identified during pretrial or at trial. The term comes from the name of a brand of number stamping machine. Internal indexes and other controls of documents in litigation often use these identifying numbers. The numbers are now often automatically affixed during electronic rapid scanning by litigation support software and services providers.

Computer-generated evidence as shown in the court is largely transient. The computer technician electronically highlights text only for an instant. The superimposed text boxes last only as long as the selected text is germane to the testimony. Thus, preserving some computer generated evidence in its original form for appellate review requires planning.

The parties provided the court with large numbers of notebooks containing traditional documents, witness lists, and identifying data in conjunction with the techniques already discussed, and pedagogicals. Were this a jury trial, including some of this information in individual juror notebooks with pictures and identifying data for witnesses would be appropriate.

The possibility of compression of evidence for record-keeping purposes is substantial. For example, plaintiffs' exhibits filling seventeen large storage boxes were reduced to two CDROM disks.

It should be noted that while the present phase of the case is a bench trial, should the court decide there is liability, the damages phase will be tried before a jury. It would seem sensible to allow a jury determining damages, if this event should come to pass, to be assisted by the same pedagogical devices the court relied upon in determining liability.

## III. *Law*

### A. *General Current Practice Excluding as Evidence*

Pedagogical devices or demonstratives have long been recognized in the form of summaries, charts and other aids used by parties "to organize or aid the jury's examination of testimony or documents which are themselves admitted into evidence." *See* 6 Margaret A. Berger, et al., Federal Evidence, § 1006.04[2] (Joseph McLauglin, ed.2000). It is a common view among courts that such pedagogical devices "are not evidence themselves, but are used merely to aid the jury in its understanding of the evidence that has already been admitted." *United States v. Janati*, 374 F.3d 263, 273 (4th Cir.2004) (citations omitted); *see also Gomez v. Great Lakes Steel Div. Nat'l Steel Corp.*, 803 F.2d 250, 257 (6th Cir.1986). The use of such material in court is typically governed by Rule 611(a) of the Federal Rules of Evidence. *See* Fed.R.Evid. 611(a) ("The court shall exercise reasonable control over the mode and order of ... presenting evidence so as to

(1) make the ... presentation effective for the ascertainment of truth...."); *Janati*, 374 F.3d at 273 ("But displaying such charts is always under the supervision of the district court under Rule 611(a), and in the end they are not admitted as evidence."); Berger, *supra*, at § 1006.08[4] (citing court's authority under Rule 611(a)).

Courts have generally declined to treat pedagogical devices as evidence. *See* Berger, *supra*, at § 1006.08[4] ("Pedagogical-device summaries are used to summarize evidence, but they are not evidence themselves."). Although courts employ different terms for the aids, most circuits have generally excluded the devices from evidence. *See, e.g., United States v. Sawyer*, 85 F.3d 713, 740 (1st Cir.1996); *United States v. Bradley*, 869 F.2d 121, 123 (2d Cir.1989); *United States v. Pelullo*, 964 F.2d 193, 205 (3d Cir.1992); *Janati*, 374 F.3d at 273; *Gomez*, 803 F.2d at 257; *United States v. Wood*, 943 F.2d 1048, 1053 (9th Cir.1991).

In contrast to other decisions of the Court of Appeals for the Ninth Circuit, one panel of that court has seemingly sanctioned the admission of pedagogical devices under an abuse of discretion standard. *See United States v. Poschwatta*, 829 F.2d 1477, 1481 (9th Cir.1987) ("Although the better practice may have been for the court to allow the charts to be used as *testimonial aids only*, the district court did not abuse its discretion.... The figures in the government chart already were admitted into evidence and the defendant did not challenge the figures. Defendant also had a full opportunity to cross-examine the witness. The charts arguably contributed to the clarity of the presentation to the jury and were a reasonable method of presenting evidence.") (citations omitted) (emphasis added). The Court of Appeals for the Sixth Circuit, in dicta, has

recognized instances in which the admission of pedagogical devices is appropriate:

We note in passing that in appropriate circumstances not only may such pedagogical device summaries be used as illustrative aids in the presentation of the evidence, but they may also be admitted into evidence even though not within the specific scope of Rule 1006. Such circumstances might be instances in which such pedagogical device is so accurate and reliable a summary illustration or extrapolation of testimonial or other evidence in the case as to reliably assist the factfinder in understanding the evidence, although not within the specific requirements of Rule 1006.

*See United States v. Bray*, 139 F.3d 1104, 1111–12 (6th Cir.1998).

Pedagogical devices are often unfavorably compared to summaries admitted under Rule 1006. *See* Fed.R.Evid. 1006; The Evidence Project: Proposed Revisions to the Federal Rules of Evidence, 171 F.R.D. 330, 677 (Thomas C. Goldstein, ed. 1997) ("[S]ome courts ... allowed summaries to be used only as nonevidentiary pedagogical devices."). Summaries, unlike Rule 611(a) aids, are admissible as proxies for voluminous records "which cannot be examined in court." Fed.R.Evid. 1006. Exclusion of pedagogical devices is grounded in the idea that such aids "are more akin to argument than evidence since [they] organize[ ] the jury's examination of testimony and documents already admitted in evidence." *Bray*, 139 F.3d at 1111. Nevertheless, the distinction between Rule 1006 summaries and Rule 611(a) pedagogical devices is often ignored by courts, and many admitted summaries actually restate previously admitted evidence. One commentator found that in one hundred percent of a sample of health care fraud cases the courts allowed pedagogical tools into evidence. *See* Pamela H. Bucy, *The Poor*

*Fit of Traditional Evidentiary Doctrine and Sophisticated Crime: An Empirical Analysis of Health Care Fraud Prosecutions,* 62 Ford. L.Rev. 383, 416–17 (1994). The evidence treatises caution that pedagogical devices should be used only in conjunction with proper limiting instructions, "that jury aids ... are not evidence-in-chief but are only the proponent's organization of the evidence presented." Berger, *supra,* at § 1006.08[4].

## B. *Theory and Practice Supporting Admission in Evidence*

The purpose of a trial is to reveal the relevant real-world facts and to draw inferences leading to proof or disproof of operative elements of a cause of action; it is essentially a teaching learning process. *See, e.g., Tehan v. Shott,* 382 U.S. 406, 416, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966) ("The basic purpose of a trial is the determination of truth. . . ."). As the eminent professors Jerome Michael and Mortimer Adler put the matter:

> In its logical aspect the trial of an issue of fact can be viewed as a process of teaching: By their proof and disproof of the contradictory propositions of which the issue is constituted, the litigants impart to the jury the knowledge which it needs in order to resolve the issue. . . . The process which, from the point of view of jurors, is a passive affair of learning or inference and, from the point of view of litigants, an active affair of teaching or proof, is a single process.

Jerome Michael & Mortimer J. Adler, *Real Proof: 1,* 5 Vand. L.Rev. 344, 344–46 (1952).

Forensic courtroom teaching is expected to be grounded in the real world. Evidence of that world is produced, and from that evidence, using hypotheses, generally based on knowledge the trier brings to the case, opinions are formed. They are based upon rational syllogisms, leading to conclusions about statements of fact that are material propositions (sometimes called operative facts) defined by the law. *See* John H. Mansfield, Norman Abrams & Margaret A. Berger, et al., Cases and Materials on Evidence 11–15 (9th ed.1997).

Michael and Adler describe the "kinds of knowledge involved in a trial:"

> (1) Knowledge which the jury has independently of the evidence and proofs of the litigants, most of which it will possess prior to the trial because in the locality of the trial such knowledge is common to ordinary men or ordinary experience, but some of which it may acquire during the trial; (2) knowledge which the jury acquires by means of its sense in the observation of things and events which the litigants are permitted to introduce as evidence; (3) knowledge which the jury acquires by means of its reason in making the inferences involved in the steps and lines of proof which the litigants are permitted to accomplish; and (4) knowledge which witnesses are permitted to report or which is contained in documents which the litigants are permitted to exhibit to the jury.
>
> Without knowledge of the third sort, that obtained inferentially during a trial by its rational powers, a jury could never decide a material issue; if it could, a trial need not and would not involve proof.

Michael & Adler, *supra,* at 348.

The claim in this case is relatively simple: false or misleading advertising was used by defendant to harm the plaintiff. The methods of proof, however, involve complicated statistical data and expert testimony. This intricacy of proof is increasingly typical of federal trials. Michael and Adler's third type of knowledge, using the inferential powers of the jury and court, is difficult to acquire in such trials. Jurors can be authorized to take notes, but if the

evidence and case are too complicated, their on-the-run jottings will do them little good in their jury room reasoning; ultimately, it is the trier's ability to think clearly in integrating evidence and arguments and in drawing rational conclusions that is the essence of our system of trials. *Cf. United States v. Casamento*, 887 F.2d 1141, 1151 (2d Cir.1989) ("This court has long approved the use of charts in complex trials, and has allowed the jury to have the charts in the jury room during its deliberations, so long as the judge properly instructs the jury that it is not to consider the charts as evidence.") (citations omitted).

The revolution in communicating that has occurred and is still occurring may sometimes be distracting, but it can strengthen the ability of courts to seek truth. Technology in litigation has changed enormously since the adoption of the Federal Rules of Evidence in 1975. *See, e.g., In re Electronic Case Filing*, Administrative Order 2004–08 (E.D.N.Y. June 22, 2004) ("Beginning on August 2, 2004, electronic case filing will be mandatory for all civil cases other than pro se cases and for all criminal cases."). In any complex case, computer-generated presentations are the norm rather than the exception. As one commentator put it, "[d]esktop portable computers now bedeck courtrooms like dandelions in May and, like dandelions, their number, use and application continue to grow." Edward A. Hannan, *Computer–Generated Evidence: Testing The Envelope*, 63 Def. Counsel J. 353, 362 (1996). *Cf.* Note, *The Case for Disk–Based Litigation: Technology and the Cyber Courtroom*, 8 Harv. J. Law & Tech. 471, 471 (1995) ("[O]pponents blame such high-technology presentation tools for accelerating the deterioration of the trial system's integrity.").

Subject to Rule 403, with somewhat more stringent control in jury trials, peda-gogical aids should generally be admitted as evidence. They can be helpful to the court's understanding of the complex and voluminous amount of evidence presented, as in this case. The court is not as susceptible to the confusion the admission of such evidence might induce in juries. But this evidence should also be admitted as evidence in jury trials if it satisfies the requisites of Rules 402 and 403 of the Federal Rules of Evidence.

Evidentiary rulings should be guided, as usual, by Rule 403. The district court's normal discretion can be utilized to mitigate situations in which parties have vastly different resources, creating an uneven technological playing field. In the instant case, both parties have the financial wherewithal to present comparable computer-generated evidence. The suggestion that trials are turning into legal smoke and mirror laser shows, lacking real substance, has no merit where the court exercises appropriate control.

In light of ever-changing technology, wide ownership of personal computers, expanding use of the internet, and personal digital assistant devices, among other electronic innovations, the lay person is increasingly immune to confusion by the encroachment of technology into heretofore primitive communication zones such as the jury room. *See, e.g., Datskow v. Teledyne Continental Motors*, 826 F.Supp. 677, 685 (W.D.N.Y.1993) ("Jurors, exposed as they are to television, the movies, and picture magazines, are fairly sophisticated. With proper instruction, the danger of their overvaluing such proof is slight.") (quoting 1 J. Margaret A. Berger, et al., Federal Evidence ¶ 403[5] at 403–88 (1992 ed.) (footnotes omitted)).

The day may soon come when jurors routinely have individual computers or computer monitors in the jury room. Most testimony in federal trials is already

recorded electronically. It is the usual practice for parties to maintain backups of computer-generated evidence in the event of computer malfunction. *See, e.g.,* Federal Judicial Center, Effective Use of Courtroom Technology: A Judge's Guide to Pretrial and Trial at 56 (2001) ("Another common occurrence is an occasional computer crash. A backup of all the files on an external disk assures that the lawyer will be able to recover quickly."). Disks can be easily scrubbed to eliminate extraneous portions and "corrected" new disks fed into the jury room as needed, eliminating endless readbacks and enabling the court to get onto the next case without delay.

Modern juries take notes, have notebooks containing key evidence, and can ask questions through the court. In the near future, they may have notebook computers. They need not be treated as illiterates as under the old English practice.

Federal courts have sought to exclude outside influences from the courtroom. *See, e.g.,* Fed.R.Crim.P. 53 (provision against the photographing or broadcasting of criminal proceedings). But the use of technology is not inconsistent with calm deliberations based on material properly vetted for the courtroom. *See, e.g.,* J. Owen Forrester, *The History of the Federal Judiciary's Automation Program,* 44 Am. U.L.Rev. 1483, 1490 (1995) ("One does not have to be a futurist to predict correctly that automation tools will overtake and rapidly change traditional methods used by lawyers, judges, and court managers. Whether automation within the courts changes as rapidly as it is capable depends on budget restrictions, the rate at which judges and managers become comfortable with automation, and the rate at which technical support staff can adapt to new technologies.").

There are now relatively few trials in the district courts, but when they do take place, substantial technological and other effort is often expended to present a case. *See, e.g., Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,* 190 F.Supp.2d 407, 425 (E.D.N.Y.2002) (awarding attorney's fees of $37,841,054.22); *Cefalu v. Village of Elk Grove,* 211 F.3d 416, 429 (7th Cir.2000) ("[W]e believe that prevailing parties can, under appropriate circumstances, be reimbursed for the cost [in excess of $27,000] of computer generated, multimedia presentations even to the degree that such presentations are used not to produce exhibits but rather to display them to the court."); Colleen Debaise, *Courtroom–Technology Firms Give Evidence State–of–the–Art Look,* Wall St. J., May 26, 2004 ("[T]he firm typically charges about $5,000 a week for trial technology, plus an additional $6,000 to $10,000 a week for the use of a staff technician.").

Presenting an appellate court with only a print transcript would drain much of the color and depth from the presentation that occurred in the courtroom. *See In re Sentencing,* 219 F.R.D. 262 (E.D.N.Y.2004) (use of video cameras in sentencing so appellate court can see the defendant and family). There is no reason appellate judges should deny themselves the same learning advantages available to trial judges, juries and the world at large. *Cf. McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 551 n. 3, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) ("Appellate tribunals are poor substitutes for trial courts for developing a record or resolving factual controversies.").

Yet, since the courts of appeal are already over-burdened, they may not have the time to fully review computer-generated and other pedagogical evidence. *See, e.g., Dunton v. Suffolk County,* 748 F.2d 69, 70 (2d Cir.1984) (referring to "unnecessarily swollen appellate dockets"). The

Court of Appeals for the Second Circuit has, for example, sometimes taken a narrow view of the admissibility of audiovisual evidence. *See, e.g., Rotolo v. Digital Equipment Corp.,* 150 F.3d 223 (2d Cir. 1998) (vacating judgment based on films characterized as inadmissible hearsay evidence), *rev'g in part Geressy v. Digital Equipment Corp.,* 980 F.Supp. 640 (E.D.N.Y.1997) (finding that keyboard caused repetitive stress injuries, utilizing as evidence training films used in the keyboard industry). *But see Gonzalez v. Digital Equipment Corp.,* 8 F.Supp.2d 194 (E.D.N.Y.1998) (coming to a conclusion regarding admissibility different from that of the court of appeals in *Rotolo* ). In a jury trial, the court must be particularly careful to avoid the interjection of material that an appellate court may believe to contain unacceptable hearsay, prejudicial opinions or other material, even though it is easily discountable by properly instructed jurors.

There may be occasions when the ability of the attorney to utilize computer-generated evidence to manipulate the viewer's subconscious may escape the awareness of the court. In the instant case, for example, the choice of red-colored text for the plaintiff's subtitled video depositions and blue-colored text for the defendant's selections could be motivated by a reasonable belief that red and blue text have varying influences on the viewer. *See, e.g.,* Elizabeth L. Browning, *Demonstrative Evidence Created In–House,* 34 Houston Lawyer 19 (1998) ("Red is an attention-getter. For an important fact, such as a name, an event, or a dollar total to a series of numbers, use red. Present your client in cool, pleasing colors, such as blues and greens.").

Courts should be aware of the heightened power of audio-visual evidence. Showing the trier deposition testimony in color, for example, revealing vivid body language, pauses and verbal emphasis, sometimes elicits a different reaction from the viewer than would a reading of a typed transcript. The trial court must exercise appropriate sensitive control over the proceedings, issuing limiting instructions when appropriate, to ensure that the results of a trial are not tainted by misunderstanding and prejudice. *See United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir.2004) (abuse of discretion standard in evidentiary rulings); Fed.R.Evid. 611 Advisory Committee's Note ("The ultimate responsibility for the effective working of the adversary system rests with the [trial] judge.").

Increased flexibility in the use of educational devices will probably result in courtroom findings more consonant with truth and law. Whether designated as "pedagogical devices" or "demonstratives," this material may be admitted as evidence when it is accurate, reliable and will "assist the factfinder in understanding the evidence." *Bray,* 139 F.3d at 1112. Present highly professional and skilled counsel agree. They have stipulated to admit in evidence each of the non-stricken excellent pedagogical devices used in the trial.

IV. *Conclusion*

All pedagogical devices that the court has seen or heard are admitted as evidence, except where the court has ruled some such evidence unsatisfactory in conception or execution, and it has been stricken. The devices clarified relevant evidence and issues and are accurate and reliable. Their probative value is not "substantially outweighed by the danger of unfair prejudice or confusion of the issues, ... or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

SO ORDERED.