**VERIZON DIRECTORIES CORP., Plaintiff,**

v.

**YELLOW BOOK USA, INC., Defendant.**

No. 04–CV–0251.

United States District Court, E.D. New York.

Oct. 7, 2004.

Schlam Stone & Dolan LLP, New York, NY, by Richard Dolan, Winston & Strawn, Washington, DC, by Dan Webb, Charles Molster, Alan Howard, David Reich, Verizon, Arlington, VA, by John Thorne, John Frantz, For Plaintiff Verizon Directories Corp.

Davis Wright Tremaine LLP, by Victor Kovner, Sharon Schneier, Randy Gainer, Marcia Paul, Carolyn Foley, Matthew Leish, James Rosenfeld, Steve Chung, Samuel Leaf, Willkie, Farr & Gallagher LLP, New York, NY, by Roger Netzer, For Defendant Yellow Book USA, Inc.

## FINDINGS OF FACT AND LAW, MEMORANDUM, ORDER, & FINAL JUDGMENT

WEINSTEIN, Senior District Judge.

### I. *Introduction*

Plaintiff Verizon Directories Corp. ("Verizon"), a publisher and distributor of yellow pages telephone directories affiliated with Verizon telephone company, sued Yellow Book U.S.A., Inc. ("Yellow Book"), an independent publisher of such directories. The selling of advertising in United States yellow pages directories constitutes an almost $15 billion industry, with Verizon claiming revenue of more than $4 billion and Yellow Book approaching $1 billion in sales.

The parties have settled the case. It is the court's understanding that both will support appropriate industry-wide fair standards for surveys to determine what the usage is of their respective yellow page directories. They have thus turned this private dispute into a socially useful accord that will permit prospective advertisers in, and users of, yellow page directories to determine the value of these important merchandising tools. The public and the yellow pages directory industry will be well served by use-survey reliability and transparency. In order to understand the significance of the settlement which is now approved by the court some background on the litigation is desirable.

### II. *Facts and Procedural History*

Verizon is a business unit of Verizon Communications Inc., a Fortune 20 company and the largest phone company in the

United States. It publishes the Verizon SuperPages with more than 111 million copies circulated in thirty-four states and the District of Columbia.

Yellow Book is part of Yell Group Plc, a publicly-traded company headquartered in England that is a leading distributer of white and yellow pages directories in the United Kingdom. In the United States Yellow Book is the largest independent directory publisher not affiliated with the local company providing wire telephone services. Seventy-one million copies of its yellow pages directories circulate in forty-one states and the District of Columbia.

Verizon and Yellow Book compete as the two principal yellow pages directory publishers in approximately 120 local markets, most of which Verizon occupies as the incumbent telephone company. Among the most significant of these markets are: Boston; Manhattan; Nassau County, New York; Philadelphia; Pittsburgh; Baltimore; Washington, D.C.; Northern Virginia; and Tampa.

In January 2004, Verizon filed an action against Yellow Book asserting claims for: (1) false representations in sales and marketing communications and false advertising under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) unfair competition and false advertising under sections 349 and 350 of the New York General Business Law; and (3) product disparagement under New York common law.

Verizon claimed that through television commercials and other advertising, as well as an integrated sales program, Yellow Book communicated to consumers and advertisers the false claim that Yellow Book's directory is used more than Verizon's book, the "SuperPages," in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and sections 349 and 350 of the New York General Business Law.

Plaintiff moved for a preliminary and final injunction enjoining Yellow Book from engaging in marketing communications making representations to the effect that more people use Yellow Book than the Verizon SuperPages. Yellow Book opposed the application for injunctive relief and cross-moved to dismiss on the ground that its television commercials and other advertising constituted non-actionable puffery.

In February 2004 Verizon's motion for a preliminary injunction was denied. Yellow Book's motion to dismiss was denied in March 2004 except that the product disparagement claim was dismissed for failure to allege specific damages. The parties agreed to a bench trial beginning in July 2004 on the issues of liability and injunctive relief.

Pursuant to expedited schedules imposed by the magistrate judge, the parties conducted extensive discovery. They took some seventy-five depositions and exchanged millions of pages of documents.

Trial on the liability and injunctive phases was held from July 26 to August 18, 2004. The parties presented extensive documentary and testimonial evidence, including expert testimony. *See, e.g., Verizon Directories Corp. v. Yellow Book USA, Inc.*, 331 F.Supp.2d 136 (E.D.N.Y.2004); *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 331 F.Supp.2d 134 (E.D.N.Y. 2004).

Verizon established that 1) Yellow Book made false statements of fact claiming greater use of its yellow pages directories as compared to Verizon's SuperPages, 2) some consumers may have believed these Yellow Book claims, and 3) Verizon may have been damaged by them.

An injunction is not required. A jury trial to assess damages was to begin on

December 13, 2004; it is no longer necessary.

### III. *The Industry*

#### A. *History of Telephone Directory Publishing*

The yellow pages telephone directory was developed by Reuben H. Donnelley, the son of the founder of the R.R. Donnelley printing company. He produced in Chicago in 1886 the first yellow pages directory featuring business names and phone numbers categorized by the types of products and services. Eventually that book became the Illinois Bell Yellow Pages.

Prior to divestiture in 1984, telephone directory publishing was almost wholly the domain of the incumbent telephone companies—AT&T (the Bell system) and its wholly owned subsidiaries, the Bell Operating Companies ("BOCs"). Telephone directories generally consisted of a single volume containing white pages with alphabetical listings and yellow pages with classified listings and advertisements. Publication was usually carried out as part of the telephone company's regulated operation—that is, the costs and revenues associated with telephone directory business were included in calculating regulated telephone service rates. In spite of the AT&T monopoly several small independent directory publishers—those not affiliated with an incumbent telephone company—managed to survive by offering specialized directories that did not compete head-to-head with those published by the BOCs.

A consent decree that led to the breakup of AT&T was entered in 1982 and became effective in 1984. *See United States v. AT&T Co.*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). It allowed the BOCs to retain their directory publishing operations.

Originally there were seven newly-divested Regional Bell Operating Companies ("RBOCs"). After a series of mergers, the original seven have become BellSouth, QuestDex, SBC, and Verizon. The RBOCs generally did not continue to operate their directory publishing businesses as part of their regulated telephone operations, but instead created separate publishing subsidiaries. These RBOC-affiliated directory publishers continued to dominate the industry. One reason for this was that the RBOCs did not make access to directory listings available to independent publishers on terms consistent with those on which they were made available to their own publishing affiliates. A series of legal challenges to this practice helped to even the playing field for independent publishers. *See, e.g., Feist Publ. Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 363, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (holding that names, towns and telephone numbers of utility's subscribers are not entitled to copyright protection); *Great Western Directories, Inc. v. Southwestern Bell Tel. Co.*, 63 F.3d 1378, 1386–87 (5th Cir.1995) (holding that price increases for subscriber listing information by Southwestern Bell violated antitrust laws), *superseded in part*, 74 F.3d 613 (5th Cir.1996).

The Telecommunications Act of 1996, codified at 47 U.S.C. § 151 *et seq*, was designed "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans...." H.R. Conf. Rep. No. 104–458, at 113 (1996), *reprinted in* U.S.C.C.A.N. 124. With its passage independent publishers were guaranteed access to telephone subscriber listings on

reasonable and nondiscriminatory terms. 47 U.S.C. § 222(e).

### B. *The Yellow Pages Industry Today*

Until relatively recently, virtually all major telephone directories consisted of a single volume containing white page alphabetical listings and yellow page classified listings and advertisements. As directories became more voluminous it became necessary to publish separate volumes, especially for larger metropolitan areas. Today some publishers publish only a yellow page directory, while others publish both a white page and a yellow page directory.

Telephone directories are generally distributed at no cost to homes and offices on an annual basis. "Primary distribution" is made by hand delivery so that every residence and business within the intended scope of the directory receives a copy. Many publishers—including both parties to the present action—also make a "secondary distribution" to new residents and business.

Much like broadcast television and newspapers, publishers do not make their money from directory users, but through the sale of classified advertising that is displayed within a particular business category in the yellow pages. Between 80–90% of yellow pages advertising is purchased by small local businesses. The directory publisher's sales force may telephone potential advertisers or visit them at their place of business. During a visit the prospect may be shown a variety of sales materials such as charts and graphs, metered advertisements, and testimonials from satisfied customers attesting to a particular directory's usage and the desirability of placing an advertisement in that directory.

National and regional advertisers generally purchase advertising in multiple directories through specialized sales agents known as Certified Marketing Representatives (CMRs). CMR sales account for between 10–20% of the revenue for directory publishers.

Some directory publishers also offer online electronic yellow pages. Like the print version of the directory, the online service is offered at no charge to users. Advertisers in the print directory typically get a basic listing online at no charge, although they may purchase additional space or priority placement online for an additional fee.

### C. *Competition Between RBOC Affiliates and Independent Directory Publishers*

The yellow pages business is highly competitive. In any given market, the competitive landscape may include the RBOC affiliate as well as several independent publishers. It also may include one or more additional RBOCs functioning as independents by publishing directories outside the geographic areas in which they are associated with the incumbent telephone company and within the telephone footprints of other RBOCs. Verizon, for instance, publishes approximately 1,100 directories in areas in which it is also the phone company as well as 120 directories in areas outside its wire-telephone footprint. In the latter areas its status is equivalent to that of other independent directory publishers.

In addition to competing among themselves, yellow pages publishers must compete with other forms of advertising such as direct mail, fax spam, newspaper, radio, and television. Small businesses wishing to advertise typically have a limited advertising budget; they may need to forgo or minimize yellow pages advertising by choosing only one of competing directories.

Apart from the obvious benefits of size and financial resources, the RBOCs have other advantages over independent publishers by virtue of being associated with the incumbent telephone company. The white and yellow pages are still bound together in one directory in some geographic areas, making it impracticable for someone to keep the white pages while discarding the yellow pages in favor of a competitor's yellow pages. In addition, charges for advertisements in RBOC directories may be bundled together with charges for telephone service and placed on the same bill, a convenience not afforded to those placing ads with independent directory publishers.

Despite the advantages of being associated with the incumbent telephone company, the RBOC affiliates no longer enjoy a monopoly over telephone directory publishing. They have experienced a steady decline in annual market share since 1995, dropping from 96.1% to a projected 81.8% in 2004. The yellow pages industry, however, continues to be highly lucrative for the RBOCs. In 2003 SBC, Verizon, BellSouth, and Dex Media reported sales revenues of $4.254, $4.114, $2.050, and $1.513 billion respectively.

Since the passage of the Telecommunications Act in 1996, independent publishers are increasingly competing head-to-head with the RBOCs and gaining a larger share of the market. In 1998, they exceeded $1 billion in collective revenue for the first time, representing a market share of 8.3%. By 2002, their revenue approached $2 billion, with a market share of 11.8%.

### D. *Directory Usage Studies*

Recognizing that usage of yellow pages is important to advertisers when deciding which, if any, directories to advertise in, publishers typically commission research firms to conduct surveys on their behalf. These surveys—so-called proprietary surveys—are somewhat controlled by the publisher that pays for them. Possession and usage statistics generated from such surveys are used in internal corporate administration as well as in marketing and sales materials aimed at advertisers and potential advertisers. There are no uniform industry-wide standards, methods, or practices for conducting surveys of possession and usage of yellow page directories.

The use of publisher-controlled surveys and the lack of standard survey definitions and methodology means that possession and usage figures are susceptible to manipulation and misrepresentation by directory publishers for their own advantage. National advertisers, as well as an increasing number of local and regional advertisers, have voiced skepticism about the reliability of proprietary usage statistics. Figures purporting to compare possession and usage for one directory with that of another are particularly suspect since the distribution areas of competing directories are generally not identical and each publisher commissions studies for its own areas of distribution.

Inflation of usage figures have plagued other advertising media, most notably the newspaper industry. *See, e.g.,* James T. Madore, *Audit Finds More Circulation Errors,* Newsday (New York), July 16, 2004 ("The circulations of Newsday and Hoy were inflated to a greater extent than has been disclosed, parent Tribune Co. said yesterday in announcing it was setting aside $35 million to pay settlements to aggrieved advertisers."); Kevin McCoy, *Tapes Bare Mob Hold on Post,* Newsday (New York), July 23, 1992, at 29 (reporting that the New York Post inflated daily circulation figures by more than 50,000 for which it pled guilty to fraud and agreed to give advertisers $2.3 million in rebates).

Syndicated independent third party survey research similar to that used by other advertising media (*e.g.,* Nielsen for television and Arbitron for radio) would help ensure that advertisers and potential advertisers are presented with reliable possession and usage statistics when choosing directories. Recently a consortium of publishers, national advertisers, certified marketing representatives, yellow pages industry trade associations, and other interested persons, including Verizon and Yellow Book, began discussions on developing national guidelines for syndicated research. Some have tentatively chosen a firm, Knowledge Networks/SRI, to pilot a reliable uniform survey of usage. It is anticipated that the first syndicated study could be made available to advertisers and potential advertisers by January 2006.

## IV. *Liability*

■ Verizon has proven by a preponderance of the evidence that Yellow Book violated the Lanham Act by falsely claiming, as to national and some specific geographic areas, that the usage of Yellow Book's yellow pages was substantially greater than it actually was, as compared to the usage of Verizon's SuperPages. The trial demonstrated that Verizon enjoys substantially greater usage of its directories nationally and in most of the local markets in which it competes with Yellow Book. Verizon's rates are, however, much higher, so that Yellow Book could still be competitive even if usage of its directories and those of Verizon were reliably established.

Despite the adverse usage figures known to it, Yellow Book launched and sustained an integrated advertising campaign in virtually every form of media, including television, radio, newspapers, billboards, and direct mail, that communicated by subtle messages to a significant number of consumers that Yellow Book is used more than those directories published by Verizon. These misleading messages were also incorporated in some sales collateral used by Yellow Book's sales people in some geographic areas to induce some small business owners to purchase advertising in its yellow pages directories. In some of its sales collateral Yellow Book referenced research studies performed by the Harris research organization that employed dubious survey methodology; the data was then manipulated by Yellow Book employees, resulting in inflated usage figures for Yellow Book's directories compared to those for Verizon in some geographic areas.

The credible evidence demonstrated that, at least in a few cases, advertisers were probably motivated by these false claims to purchase advertising in Yellow Book. It is possible that Verizon suffered some harm as a result of Yellow Book's false claims. Even if the harm was minimal, it is probably sufficient to establish standing under the Lanham Act.

■ The evidence also established that Yellow Book violated the New York General Business Law. The threshold requirement that a defendant's acts be "consumer-oriented," is satisfied because Yellow Book's greater usage claims were part of a broad campaign that probably had an impact on consumers in New York state. Small business owners, as purchasers and potential purchasers of advertising in yellow pages directories, qualify as "consumers" within the meaning of the statute.

Unlike *Cruz v. NYNEX Information Resources,* 263 A.D.2d 285, 703 N.Y.S.2d 103 (App.Div.2000), the deceptive conduct at issue in this case is not confined to a private contract dispute between businesses, but, rather, is based on a statewide and national advertising campaign directed at millions of users of yellow pages and tens of thousands of potential advertisers,

distributed in a wide array of media on a large scale. The evidence demonstrates that Yellow Book's false claim of greater usage may have had an impact on at least a few businesses misled as to the value of the advertisements they purchased, as well as on some members of the general public probably denied in at least some cases a more extensive listing of businesses in the yellow pages directories they used.

■ The actual damage shown to date is slight, bordering on the minuscule. Verizon would, the court decided before settlement, have the opportunity to demonstrate more substantial damage. Accordingly, a jury trial was set to establish damages pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and sections 349 and 350 of the New York General Business Law.

Damages would have been particularly difficult to show because the industry as a whole, including Verizon, is suffering a gradual decline in revenues. Among the reasons for this decline are: the lack of trust on the part of advertisers in possession and usage figures generated by survey research firms hired by individual publishers; the availability on the internet of information previously found only in yellow pages print directories; and the increased reliance by consumers on shopping malls and all-purpose stores such as Walmart and Home Depot, resulting in the closure of many small businesses which traditionally advertised in the yellow pages. Attributing loss of Verizon's revenue to false advertising by Yellow Book is also highly problematic since Yellow Book's share of the market had been rising for some years before the start of the advertising campaign at issue.

In light of the evidence thus far presented it is unlikely that a jury would find substantial damage to Verizon. Under such circumstances it is doubtful that the court would be warranted in imposing the costs of the litigation on Yellow Book or that it would otherwise enhance a jury's award utilizing its discretion under state and federal law.

Since no damages have been found, use of this judgment as a basis for third party suits is not appropriate.

### V. *Injunction*

■ As matters now stand, the undertaking and stipulation of Joseph Walsh, President and Chief Executive Officer of Yellow Book dated August 30, 2004 is sufficient to prevent any future harm to Verizon by virtue of Yellow Book's deceptive conduct. It provided as follows:

1. Defendant shall not hereafter broadcast, cablecast or otherwise publish or distribute any of the TV Ads or the Radio Ads [complained about] hereafter in any form or medium;

2. Defendant shall promptly issue a directive to its sales force to remove the storyboards reflecting the TV Ads or Radio Ads, as well as reaffirming its earlier directive to remove any of the existing Harris surveys, or sales collateral based on the existing Harris surveys, from the binders from all of its sales representatives.

On September 2, 2004 the court ruled: "Without respect to whether plaintiff is entitled to further relief, this stipulation by defendant is made an order of the court."

An injunction is not required at this time for the following reasons:

1) The court is satisfied with the *bona fides* of Mr. Walsh. He took immediate steps to remove misleading survey data from use by Yellow Book's salespeople when he discovered during the course of the trial that the surveys were methodologically flawed and were being used improperly in inflating the apparent usage of

Yellow Book compared to Verizon directories. There is no reason to believe that past improprieties will continue in the future.

2) Any effective injunction would require the supervision by the court of the work of many salespeople all over the United States employed by both Verizon and Yellow Book. Even a *mea culpa* injunction under which Yellow Book would inform prospective advertisers of past improprieties, as proposed by Verizon, would in effect place Yellow Book and its salespeople at a serious future competitive disadvantage to Verizon and its salespeople. It might encourage circumvention of anti-trust laws and would interfere with healthy competition for yellow pages advertisers. Such an anti-competitive effect on the yellow pages industry is contrary to public policy. The competitive environment which has grown up since the passage of the Telecommunications Act of 1996 should not inadvertently be jeopardized by court order.

3) The yellow pages industry requires, if it wishes to remain a healthy competitor with other advertising media, a reliable industry-wide survey procedure which can produce believable comparative and actual usage figures for potential advertisers. The evidence showed that it is entirely practicable to provide such reliable information and that the industry is in a position to adopt such a system. Such a voluntary national system would do more for truth in advertising, protection of the consumer, and the economic health of the industry than any injunction or damages in this litigation.

## VI. *Unclean Hands Defense*

The defense of unclean hands does not apply to either the issue of liability or an injunction. The evidence established that Verizon was influential in decisions by its survey research firm, Gallup, as to the scope and timing of possession and usage studies and that this increased apparent average yearly usage estimates, but this practice seems endemic to the field. The evidence also suggested that some Verizon salespeople were so hostile to Yellow Book that they made false claims that Yellow Book failed to make an adequate distribution and redistribution of its directories. No proven deceptive conduct on the part of Verizon employees using Gallup studies rose to a level sufficient to bar recovery.

## VII. *Conclusion*

Findings of fact and law are set forth in this memorandum. *See* FED. R. CIV. PRO. 52.

The Clerk of the Court shall forthwith issue a judgment dismissing the case.

SO ORDERED.